# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AMANDIA WILLIAMS,

       Plaintiff,

    vs.                                     Civ. No. 22-640 KK

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

THIS MATTER is before the Court on Plaintiff's Motion to Reverse the Administrative Law Judge (ALJ) Unfavorable Decision Dated July 29, 2021, or Alternatively, to Remand the Case Back to the Administrative Law Judge (ALJ) (Doc. 19), and brief in support (Doc. 20), both filed on January 12, 2023. In her motion and brief, Plaintiff challenges the determination of the Acting Commissioner of the Social Security Administration ("Commissioner") that she is not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401–34, or to supplemental security income ("SSI") under Title XVI of the SSA, 42 U.S.C. §§ 1381–83f. On May 18, 2023, the Commissioner filed a response, and on June 1, 2023, Plaintiff filed a reply. (Docs. 26, 27.) The Court has thoroughly reviewed the administrative record, the parties' briefs, and the relevant law, and for the reasons set forth below, finds that Plaintiff's motion is not well-taken and will be DENIED.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 12.)

## I. BACKGROUND AND PROCEDURAL POSTURE

On November 29, 2012, and December 3, 2012, respectively, Plaintiff filed applications for SSI and DIB. (*See* Administrative Record ("AR") 125, 139, 289.) In her applications, Plaintiff alleged that she became disabled on June 15, 2010, due to post-traumatic stress disorder ("PTSD"), fibromyalgia, chronic depression, anxiety disorder, degenerative disc disease, carpal tunnel syndrome, high blood pressure, and diabetes. (AR 125, 139.) Plaintiff's date last insured, for purposes of her DIB claim, was December 31, 2012. (AR 139.)

Plaintiff's application was denied at the initial level on February 1, 2013 (AR 125–52), and at the reconsideration level on August 14, 2013 (AR 155-88). Following a hearing, Administrative Law Judge ("ALJ") Myriam C. Fernandez Rice issued a decision on May 29, 2015, in which she determined that Plaintiff was not disabled under the relevant sections of the SSA. (AR 16–29.) After the Appeals Council denied review of ALJ Fernandez Rice's decision (AR 1–4), Plaintiff sought judicial review in this Court (*see* AR 1804–05). On February 28, 2017, the Honorable Gregory B. Wormuth, United States Magistrate Judge, granted the Commissioner's unopposed motion to remand the case to the SSA for further proceedings. (AR 1804–05); *Williams v. Berryhill*, 16-cv-1169 GBW (Doc. 20) (D.N.M. Feb. 29, 2017).

On remand, ALJ Lillian Richter held a second administrative hearing on February 8, 2018, (AR 1737–1798), and on August 16, 2018, determined that Plaintiff was not disabled under the relevant sections of the SSA (AR 1710–27). Plaintiff again appealed to this Court, and on December 7, 2020, the Honorable Kevin R. Sweazea, United States Magistrate Judge, granted Plaintiff's motion to reverse and remand on the basis that ALJ Richter had not adequately evaluated the opinions of Plaintiff's treating psychiatrist, Mark Beale, M.D. (AR 2157–74); s*ee also Williams v. Saul*, 19-cv-905 KRS (Doc. 27) (D.N.M. Dec. 7, 2020).

On remand, ALJ Richter held a third administrative hearing on May 20, 2021 (AR 2076–2121), and on July 29, 2021, she once again determined that Plaintiff was not disabled under the relevant sections of the SSA (AR 2047–65). The Appeals Council denied Plaintiff's request for review in a detailed order. (AR 2036–40.) Accordingly, ALJ Richter's 2021 decision became the Agency's final decision for purposes of judicial review. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On August 26, 2022, Plaintiff appealed the Commissioner's unfavorable decision to this Court for the third time. (Doc. 2.)

## II.  LEGAL STANDARDS

### A.  Standard of Review

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). "A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citation omitted).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks, brackets, and citation omitted omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citations omitted). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

**B.  Disability Framework**

"Disability," as defined by the SSA, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051–52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920(a)(4). If a finding of disability or non-disability is directed at any point, the

agency will not proceed through the remaining steps. *See Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity, if any, and the severity of her impairment or combination of impairments. *See id.* at 24–25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of establishing a prima facie case of disability[,] … the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient [RFC] to perform work in the national economy, given [her] age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## III.  THE ALJ'S DETERMINATION

ALJ Richter reviewed Plaintiff's SSI and DIB claims pursuant to the five-step sequential evaluation process described above. (AR 2047–65.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 15, 2010. (AR 2049.) The ALJ found at step two that Plaintiff suffers from the severe, medically determinable impairments of

> degenerative disc disease of the lumbar spine; obesity; displaced lumbar and thoracic discs; knee osteoarthritis; migraine[s]; post-traumatic stress disorder (PTSD); depression; chronic pain syndrome; degenerative joint disease of the right knee; metabolic syndrome, diabetes mellitus; bipolar I disorder with psychotic features; social phobia; mild anxiety, insomnia, attention deficit hyperactivity disorder[2]; and fibromyalgia.

---

[2] Somewhat confusingly, however, the ALJ also assessed Plaintiff's "adult [sic] deficit hyperactivity disorder to be a non-medically determinable impairment because the medical record of evidence does not demonstrate that this impairment was diagnosed by an acceptable medical source." (AR 2051.) Plaintiff does not challenge this potential inconsistency in her motion or brief. (*See generally* Docs. 19, 20.)

(AR 2050.) Additionally, the ALJ determined that Plaintiff suffers from the nonsevere impairments of gastroenteritis, hypertension, cannabis abuse, hyperlipidemia, hypothyroidism, and carpal tunnel syndrome. (AR 2050.)

At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the criteria of listed impairments under Appendix 1 of the SSA's regulations. (AR 2051–54.) In so holding, the ALJ found, among other things, that Plaintiff is moderately limited in four broad areas of mental functioning and that she therefore does not meet the "paragraph B" criteria of sections 12.04, 12.06, 12.11, and 12.15 of Appendix 1. (AR 2052–53.)

The ALJ went on to review the record evidence, including medical opinions and evidence from treating and consulting providers, prior administrative medical findings, and Plaintiff's subjective symptom evidence. (*See* AR 2054–63.) Having done so, the ALJ concluded that Plaintiff has the RFC to

> perform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) except [she] can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds. The claimant can occasionally stoop, kneel, crouch and crawl. The claimant should avoid exposure to vibration, unprotected heights, extreme cold and hazardous machinery. The claimant can frequently handle and finger bilaterally. The claimant can perform simple, routine and repetitive work. The claimant can have occasional interaction with supervisors and coworkers but can have no interaction with the public. She can make simple work-related decisions in a workplace with few changes in the routine work setting and can remain on task for two hours at a time.

(AR 2054.)

Based on this RFC, ALJ Richter found at step four that Plaintiff could perform her past relevant work as a housekeeping cleaner. (AR 2063.) Alternatively, the ALJ proceeded to step five, and determined that Plaintiff "is capable of making a successful adjustment to other work that

exists in significant numbers in the national economy." (AR 2063). In so holding, the ALJ relied on vocational expert ("VE") testimony that a hypothetical person with the RFC assigned to Plaintiff could perform the representative occupations of mail clerk and sorter, in addition to housekeeping cleaner. (AR 2064.) The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 15, 2010, through the date of [her] decision." (AR 2064.)

## IV.  DISCUSSION

This case has a long procedural history, with three administrative hearings and three federal court appeals. However, the issues before the Court are relatively narrow. Plaintiff contends that ALJ Richter committed four errors in her most recent decision that warrant an immediate award of benefits[3] or, alternatively, remand to the Commissioner for reconsideration of the record evidence: (1) she failed to adequately consider Dr. Beale's opinions, (Doc. 20 at 12–13); (2) her decision was not supported by substantial evidence, (*id*. at 13–17); (3) she failed to consider Plaintiff's impairments in combination, (*id*. at 17–18); and, (4) her step-five conclusions were based on VE testimony in response to a hypothetical question that did not encompass Plaintiff's limitations, (*id*. at 20–19). The Commissioner, on the other hand, insists that the ALJ's decision was supported by substantial evidence and free from harmful legal error. (Doc. 26 at 1.) As explained below, the Court agrees with the Commissioner and will therefore affirm the ALJ's decision.

### A.  The ALJ adequately considered Dr. Beale's opinions.

---

[3] The Court construes Plaintiff's request for the Court to "grant her application for disability benefits" (Doc. 20 at 19) and her contention that this eleven-year-old case is a "'rare' circumstance" (Doc. 27 at 7) to be a request for an immediate award of benefits.

Dr. Beale served as Plaintiff's treating psychiatrist from June 2015 to February 2017. (*See* AR 1975–2006.) During this time, he interviewed Plaintiff, performed numerous mental status examinations, gave her Global Assessment of Functioning ("GAF") scores, made assessments and diagnoses, and prescribed medications. (*See* AR 1975–2006.) Dr. Beale also authored two letters – one on November 23, 2015, and one on August 10, 2017 – in which he offered medical opinions. (*See* AR 1965, 1974.) In his 2015 letter, Dr. Beale explained that Plaintiff "suffers from Akathesia[4] [sic] & Bipolar Syndrome" and that "[s]he is anxious all the time, . . . cannot sleep or work because of concentration issues and the inability to pay attention as well as having difficulty with completing tasks." (AR 1965.) Dr. Beale indicated that he intended to continue treating Plaintiff with "supportive therapy with medications" and added that she "cannot work at this time and needs assistance." (AR 1965.) In his 2017 letter, Dr. Beale opined that Plaintiff "suffers from a combination of disabling emotional problems[,]" including PTSD, depression, and attention deficit hyperactivity disorder ("ADHD"). (AR 1974.) He further opined that Plaintiff is "barely able to keep up with her [activities of daily living]" and that she "[n]eeds medicine and supervision." (AR 1974.)

Because Plaintiff's claims were filed in 2012, the pre-March 27, 2017 evidentiary framework governs this case. *See* 20 C.F.R. §§ 404.1527, 416.927. Thus, the ALJ was required to apply the "treating physician rule" when considering Dr. Beale's medical opinions. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Under the treating physician rule, the ALJ is required to perform a sequential two-step inquiry. *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First,

---

[4] "Akathisia is an inability to remain physically still. It's a movement disorder that's linked to certain types of medications, especially antipsychotic medications. People with akathisia feel an intense and uncontrollable need to move — mainly, their lower body." https://my.clevelandclinic.org/health/diseases/23954-akathisia (last visited Sept. 26, 2023). In her motion and brief, Plaintiff does not challenge the ALJ's failure to discuss this diagnosis in her step-two findings. (*See generally* Docs. 19, 20.)

the ALJ must consider "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96–2p, 1996 WL 374188, at *2). "If the ALJ finds that the opinion is well-supported, [s]he must then confirm that the opinion is consistent with other substantial evidence in the record." *Id*. (citation omitted). If the opinion is both well-supported and consistent, the opinion must be given controlling weight. *Id*. Second, "even if a treating physician's opinion is not entitled to controlling weight, treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at 1301) (quotation marks and brackets omitted). Although an ALJ is not required to discuss each of the factors listed in 20 C.F.R. §§ 404.1527 and 416.927, *see Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), if an ALJ rejects a treating source opinion as inconsistent with the record as a whole, she must explain or identify the claimed inconsistencies with sufficient specificity to allow for meaningful review. *Langley*, 373 F.3d at 1123.

Moreover, the ALJ is required to discuss not only "the evidence supporting [her] decision" but also "the uncontroverted evidence [s]he cho[se] not to rely upon, as well as significantly probative evidence [s]he reject[ed]." *Clifton*, 79 F.3d at 1009–10 (citations omitted). "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). The ALJ may not "mischaracterize or downplay evidence to support her findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (citing *Talbot v. Heckler*, 814 F.2d 1456, 1463–64 (10th Cir. 1987)). In short, the ALJ must provide

"appropriate explanations for accepting or rejecting" the medical opinions at issue. *See* Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *5 (July 2, 1996).[5]

Plaintiff argues that "[t]he ALJ failed to adequately consider Dr. Beale's opinions and conclusions in light of the District Court's December 7, 2022 Order." (Doc. 20 at 12.) The Order to which Plaintiff refers is the Memorandum Opinion and Order in which Judge Sweazea reviewed ALJ Richter's 2018 decision. (*See* AR 2157–74); *see also Williams v. Saul*, No. 19-cv-905 KRS, 2020 WL 7183578 (D.N.M. Dec. 7, 2020). In her 2018 decision, ALJ Richter gave Dr. Beale's opinions "little weight" because she found that they were "not consistent with his own treatment notes . . . showing generally normal mental status examinations and GAF ratings usually in the 60s." (AR 1721.) The ALJ went on to discuss a select few of Dr. Beale's mental status examinations with almost exclusively normal findings. (*See* AR 1721.) Judge Sweazea explained, however, that Dr. Beale's treatment notes "include[d] a substantial number of entries that suggest[ed] a more serious longitudinal record" than the ALJ's discussion of his records implied. (AR 2170.) Judge Sweazea observed:

> although the ALJ described Dr. Beale's notes as "showing generally normal mental status examinations[,]" . . . the record in fact reflects that Plaintiff regularly suffered from significant disorientation, exhibited limited judgment and insight, complained of (and received treatment for) sleep problems and serious anxiety, and struggled with focus and thought processes.

(AR 2171 (internal citations omitted)). According to Judge Sweazea, Dr. Beale's findings were "often congruent" with the opinions he expressed, and the "ALJ altogether failed to address [such] findings in her [2018] decision." (AR 2171 (citation omitted).) He therefore directed the ALJ, on remand, to "properly evaluate and weigh" Dr. Beale's opinions and, if the ALJ again concluded

---

[5] Although SSR 96-5p has been rescinded for claims filed on or after March 27, 2017, *see* SSR 96-2p, 2017 WL 3928298, at *1 (Mar. 27, 2017), that guidance remains entitled to deference here because Plaintiff's claims were filed before that date.

that these opinions should be given less than controlling weight, to "provide an adequate explanation" and "address the significantly probative evidence that may be construed as supporting his opinions." (AR 2173 (internal quotation marks omitted).)

In her 2021 decision, ALJ Richter summarized Plaintiff's mental health records chronologically, with particular emphasis on the mental status examination findings in those records. (*See* AR 2058–59.) To begin, she observed that in May 2015 Plaintiff had an "inpatient stay . . . due to suicide ideations, auditory hallucinations and paranoia from personal stressors." (AR 2058 (citing AR 1166, 1501, 1511, 1538).) The ALJ further noted that, on discharge, Plaintiff "had a depressed mood . . . [but] had an intact judgment and insight, full orientation, intact memory and linear thought process." (AR 2058 (citing AR 1502, 1538).)

Next, the ALJ discussed records from November 2014 through February 2016, a period that overlapped with Dr. Beale's treatment of Plaintiff. With respect to this set of records, the ALJ observed that Plaintiff "complained of worsening depression and anxiety as well as sleep disturbances." (*See* AR 2058 (citing AR 825 (Nov. 2014 mental status exam by Valerie Acosta, DNP, noting anxious mood and indicating goals of reducing anxiety and improving sleep), AR 1980 (undated Initial Psychiatric Evaluation by Dr. Beale recording Plaintiff's report that depression and anxiety were her "worst problem"), AR 2006 (February 2017[6] progress note by Dr. Beale indicating anxious and dysphoric mood)).) The ALJ summarized the mental status examinations from 2015 and early 2017 in the record as follows: "apart from a few somatic delusions, impaired judgment and insight, disheveled appearance, pressured speech, [and] anxious and dysphoric mood, [Plaintiff's] mental exams generally showed [she had] adequate grooming,

---

[6] The February 2017 progress note cited by the ALJ includes two conflicting dates – "2/7/17" and "2/07/16." (*See* AR 2006.) Given the placement of the progress note in the record (*i.e.*, following those from January 2017), it appears that the reference to "2/07/16" was a clerical error, and that this record was, instead, from "2/7/17."

full orientation, fair to intact insight and judgment, euthymic mood, good concentration, normal speech[,] and normal thought process." (AR 2058 (citing AR 822, 825 (Jan. 2015 mental status exam from La Frontera indicating full orientation, euthymic mood, appropriate affect, logical thought processes, normal thought content, fair insight and judgment, and good concentration), AR 1979 (June 2015 mental status exam by Dr. Beale indicating full orientation, good judgment and insight, and speech and thought processes within normal limits), AR 1987–89, 2006 (Sept. 2015, Oct. 2015, and Feb. 2017 mental status exams by Dr. Beale indicating mixed results, typically with full orientation, fair or limited insight and judgment, and speech within normal limits but also, at times, with disheveled appearance, dysphoric or anxious mood, somatic delusions, irritated affect, and pressured speech)).) The ALJ also emphasized that Plaintiff "had a GAF score of 60."[7] (AR 2058 (citing AR 1979 (June 2015 GAF score recorded by Dr. Beale)).) Finally, the ALJ indicated that Plaintiff "reported an improvement in her mental conditioning with medication and improved sleep." (AR 2058 (citing AR 1989 (Oct. 2015 progress note from Dr. Beale noting that although she reported sleeping "to[o] much," Plaintiff felt "better" and her "affect and mood [are] a little lighter not as heavy")).)

Next, the ALJ summarized mental status examinations for Plaintiff from June 2019 through December 2020, a period during which Dr. Beale was no longer treating her: "apart from an occasional irritable, anxious, sad and depressed mood as well as a limited affect, mental [status] exams generally showed [Plaintiff] as cooperative and calm with clear speech, no hallucinations, full orientation, intact judgment and insight and normal thought process." (AR 2059 (citing AR

---

[7] "GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary*, 695 F.3d at 1162 n.1 (citing Am Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (4th ed. 2000)). A GAF score of 60 generally denotes "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *See id.*

590, 2449, 2453, 2467, 2489, 2495).) According to the ALJ, these "records also show[ed] that in February 2020, [Plaintiff] reported she continue[d] to go to bible studies on Tuesday nights, help[ed] with caring for her grandchildren and help[ed] her other two children." (AR 2059 (citing AR 2510 (Sept. 2020 record by Lisa Meyer, CNP, indicating that Plaintiff goes to her daughter's house during the day to help with her infant grandchildren, who were born prematurely, that she "also helps with the older two kids," and that she "continues to go to bible studies on Tuesday nights"), AR 2539 (Feb. 2020 record by CNP Meyer indicating that Plaintiff was "[g]oing to bible study group every week")).) The ALJ observed that Plaintiff reported being "stable" on her medications. (AR 2059 (citing AR 2510 (April 2020 mental health record indicating that Plaintiff "has been stable on her current medication regimen")).)

Finally, the ALJ noted that in February 2021, during a telephonic follow-up visit, "a mental status examination showed [Plaintiff had] impaired memory and . . . sad mood" but also showed that she "was cooperative, calm with clear speech, [had] no hallucinations, [had] full orientation, [had] intact judgment and insight[, and had] normal thought process." (AR 2059 (citing AR 2484, 2489, 2495).) Again, the ALJ observed that Plaintiff reported being "stable" on her medications. (AR 2059 (citing AR 2483).)

The ALJ summarized Plaintiff's mental health treatment records as follows:

> [M]ental [status] exams show occasional mood swings, poor concentration, impaired judgment and insight and pressured speech; however, overall mental [status] exams show grooming, full orientation, fair to intact insight and judgment, euthymic mood, good concentration, normal speech and normal thought process. In addition, [Plaintiff's] mental functioning improves with treatment. Further she is able to engage in robust activities of daily living. In addition, the record does not show [Plaintiff] presents for treatment with her emotional support dog. Thus, I find [Plaintiff] can perform light work with mental limitations to account for memory, concentration, social and adaption deficits.

(AR 2059 (citing AR 822, 825, 1979, 1987–89, 2006, 2483).)

Turning to Dr. Beale's 2017 opinions (*i.e.*, that Plaintiff suffers from a combination of disabling emotional problems, is barely able to maintain activities of daily living, and requires supervision), the ALJ gave these opinions little weight on the basis that they were "not consistent with the record." (AR 2061.) Specifically, the ALJ pointed to mental status examination findings from 2014 to 2017, explaining that "apart from an occasional disheveled appearance, poor concentration and mood swings, mental [status] exams show[ed] the claimant as cooperative with a full orientation, adequate grooming, normal concentration and attention span, intact memory and no suicide or homicide ideations." (AR 2061 (citing AR 822, 825, 1979, 1987–89, 2006).) She added that Plaintiff's "mental functioning improves and stabilizes with medication," and that Plaintiff is "able to engage in robust daily activities," including caring for her children, attending bible studies, and babysitting her grandchildren. (AR 2061.)

Similarly, the ALJ assigned little weight to Dr. Beale's 2015 opinions (*i.e.*, that Plaintiff is constantly anxious, cannot sleep or work because of concentration issues and difficulty completing tasks, and needs assistance). (AR 2061–62 (citing AR 1965).) First, the ALJ again explained that "these limitations are not consistent with the record, which show[ed] [Plaintiff] [was] able to engage in robust daily activities, such as attending bible studies and babysitting her grandchildren." (AR 2062 (citing AR 522 (June 2011 record from Veronica Ventura, CAN, indicating that Plaintiff is "[d]oing childcare this Summer"), 2510[8] (Sept. 2020 record from CNP Meyer indicting that Plaintiff helps with infant grandchildren during the day, also helps with "older two kids," and attends bible studies on Tuesday nights).) The ALJ again relied on mental status examination

---

[8] In her decision, the ALJ cites "B**52**F/32," which is found at AR 2409.  That record, however, is blank, and it is clear from context and from the ALJ's earlier citations (*see, e.g.,* AR 2061 (citing "B**53**F/32" to support the statement that Plaintiff is able to babysit grandchildren and attend bible studies)) that the ALJ's citation here is a clerical error.  The correct citation is to B53F/32, or AR 2510.

findings, which she characterized as "generally unremarkable." (AR 2062 (citing AR 610–11 (Nov. 2010 finding by Brian Delahoussaye, M.D., that Plaintiff's "[m]ental faculties appear intact as demonstrated by the ability to comprehend simple directions, comprehend questions, and verbally interact with examiner"), AR 1117 (same finding in Jan. 2010), AR 1979 (June 2015 normal mental status examination findings by Dr. Beale), AR 1987–89, 1991, 1994 (2015 and 2016 mixed mental status examination findings by Dr. Beale), AR 2031 (May 2018 normal mental status examination findings by Brian Whitlock, Ph.D., and Julie Jimenez, MSW, except for observations that Plaintiff appeared depressed, tearful, and anxious)).) In addition, the ALJ found Dr. Beale's opinions inconsistent with the GAF scores he recorded in his treatment records of 50–60[9] (AR 2062 (citing AR 1979 (60), 1984 (50), 1993 (50), 1995 (60))), with Plaintiff's reported ability to follow commands, write complete sentences, and interact pleasantly with medical providers, per Dr. Delahoussaye (AR 2062 (citing AR 628–29, 1117)), with Plaintiff's reported ability to answer questions without difficulty and to maintain alertness and goal directed thought, per Dr. Whitlock and Ms. Jimenez (AR 2062 (citing AR 2031)), and, finally, with Plaintiff's 2018 score of 27 out of 30 on the Folstein Mental Status Examination, indicating no cognitive impairment, per Dr. Whitlock and Ms. Jimenez. (AR 2062 (citing AR 2031).)

The ALJ specifically noted that, as Plaintiff's treating physician, Dr. Beale's opinions might have been entitled to controlling weight. (AR 2062.) Nevertheless, she explained that she accorded them little weight because Dr. Beale's "conclusions [were] unsupported by his own treatment notes and [were] inconsistent with other medical evidence of record." (AR 2062.) In

---

[9] A GAF score between 41 and 50 indicates "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning." *Keyes-Zachary*, 695 F.3d at 1162 n.1. As discussed above, a GAF score of 60 generally denotes moderate symptoms. *Id.* A GAF score from 61 to 70 indicates that a person has "[s]ome mild symptoms . . . but [is] generally functioning pretty well." *Id.*

particular, she observed that his opinions were inconsistent with the opinions of Dr. Whitlock and MSW Jimenez, which she found "more persuasive" because "better supported by and consistent with objective findings" and "with medical evidence of record." (AR 2062.)

In support of her first finding – that Dr. Beale's opinions were unsupported by his own records – the ALJ relied on the mental status examination findings and GAF scores recorded in his treatment notes. (AR 2061–62.) Dr. Beale's mental status examination findings are unquestionably mixed, containing both normal and abnormal findings.[10] But the ALJ acknowledged this when she explained that "apart from a few disheveled appearances, somatic delusions, pressured speech, dysphoric mood, and impaired judgement and insight, Dr. Beale's treatment notes show unremarkable mental exams with adequate grooming, normal speech and full orientation." (AR 2062 (citing AR 1979, 1987, 1989, 1991, 1994).)

The ALJ's finding that Plaintiff exhibited "full orientation" requires additional discussion, because it appears at odds with the Court's prior statements that Dr. Beale assessed Plaintiff as being "disoriented" on one occasion in 2015, on five occasions in 2016, and on three occasions in 2017. (AR 2170-71 (citing AR 1989, 1992–93, 1995–97, 2004-06).) As the Commissioner points out, Dr. Beale did not, on any of the referenced occasions, check the box labeled "[d]isoriented." (Doc. 26 at 13 (citing AR 1989, 1992–93, 1995–96, 2004–06).) Rather, he left the boxes for both "[o]riented" and "[d]isoriented" unchecked and instead checked the boxes, which followed, for

---

[10] *See, e.g.*, AR 1979 (neat/clean appearance, oriented, good judgment and insight, speech and thought process within normal limits), AR 1987 (normal eye contract, euthymic mood, speech within normal limits, fair judgment and insight, and somatic delusions), AR 1988 (disheveled appearance, dysphoric mood, irritated affect, limited to fair judgment and insight, and speech and thought process within normal limits), AR 1989 (normal eye contact, dysphoric mood, inconsistent affect, pressured speech), AR 1991 (disheveled/unkempt appearance, normal eye contact, fair judgment and insight, speech and thought process within normal limits), AR 1994 (fair judgment and insight, speech and thought process within normal limits), AR 2006 (dysphoric/anxious mood, fair judgment and insight, speech and thought process within normal limits).

"[p]lace," "[p]erson," "[s]ituation," and sometimes "[t]ime." (*See* AR 1989, 1992–93, 1995–97, 2004-06.)

Dr. Beale certainly could have been clearer with his notations on these occasions, as he was in June 2015, when he simply checked the box for "[o]riented." (AR 1979.) However, the Court is satisfied that the ALJ reasonably interpreted Dr. Beale's checkboxes to indicate that Plaintiff was "fully oriented." (AR 2062.) This is especially so given the numerous concurrent normal mental status examination findings, recorded GAF scores typically in the 60s,[11] and the absence of any legible notations in the records expounding on disorientation by Plaintiff. (*See* AR 1975–2006; *see also, e.g.*, AR 2006 (Feb. 7, 2017 progress note from Dr. Beale checking boxes for "[t]ime," "[p]lace," "[p]erson," and "[s]ituation" and noting anxious mood but indicating fair judgment and insight, normal speech and thought process, and a GAF score of 68).) And even if the ALJ could have drawn a different conclusion from Dr. Beale's checkboxes, this does not render her findings unsupported by substantial evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.").

Ultimately, the Court's own examination of Dr. Beale's treatment records reveals that the ALJ's summary of his findings in her 2021 decision is fair and supported by substantial evidence. Although Dr. Beale virtually never recorded findings regarding every mental status element listed on his pre-printed forms, the notations he made indicate that he generally found Plaintiff's

---

[11] The Appeals Council reasoned that because Dr. Beale's treatment records "show[ed] GAF scores of 60, 64, and 68 . . . , indicating some mild symptoms – rather than GAF scores of 40 or below that would indicate some impairment in reality testing" – the record substantially supported the ALJ's evaluation that Plaintiff had "full orientation." (AR 2037 n.1.) The Court finds this reasoning helpful and persuasive.

judgment and insight to be fair or good, her speech and thought processes to be within normal limits, and her appearance and eye contact to be normal. (*See* AR 1975–2006.) At four visits Dr. Beale did not record any mental status exam findings at all, and of the 20 visits at which he did, he recorded somatic delusions on six occasions and abnormal mood on four. (*See* AR 1975–2006.) Moreover, in contrast to her 2018 decision, ALJ Richter explicitly mentioned these abnormal mental status examination findings in her 2021 decision. (AR 2062 (citing AR 1979, 1987, 1989, 1991, 1994).) And, critically, the Court can follow her reasoning, *i.e.*, that the largely unremarkable mental status examination findings, though punctuated by occasional abnormal findings, fail to support Dr. Beale's opinions that Plaintiff suffered from disabling mental and emotional impairments, was constantly anxious, could not sleep or work due to concentration, attention, and task-completion issues, required supervision, and could barely keep up with her activities of daily living.

The ALJ also offered a second reason for her finding that Dr. Beale's opinions were inconsistent with his own treatment records. (AR 2062). Specifically, she found the range of GAF scores Dr. Beale recorded in his treatment notes to be inconsistent with disabling symptoms. (AR 2062.) Describing "GAF scores of 50-60," the ALJ arguably characterized the scores as lower than they actually were. More precisely, Dr. Beale recorded GAF scores that were 60 much more often than 50, and that twice exceeded 61, indicating only mild symptoms.[12] (*See* AR 1984, 1993 (50), 1979, 1995, 1997–2000, 2004–05 (60), 2003 (64), 2006 (68).) Either way, the Court can follow the ALJ's reasoning, *i.e.*, that the range of GAF scores recorded in Dr. Beale's records (*i.e.*, two GAF scores of 50 and ten of 60 or higher) are inconsistent with his opinions that Plaintiff's mental

---

[12] A GAF score from 61 to 70 indicates that a person has "[s]ome mild symptoms . . . but [is] generally functioning pretty well." *See Keyes-Zachary*, 695 F.3d at 1162 n.1.

impairments rendered her unable to sleep or work and barely able to keep up with her activities of daily living.

In terms of consistency with other portions of the record, the ALJ found Dr. Beale's opinions inconsistent with other medical evidence and with the May 22, 2018 opinions of consultative examiners Dr. Whitlock and Ms. Jimenez, which she found "more persuasive." (AR 2062; *see also* AR 2028–32.) Elsewhere in her decision, the ALJ summarized the opinions of Dr. Whitlock and Ms. Jimenez, in which they indicated that Plaintiff "could understand and remember basic instructions but would have some difficulty with adapting to workplace changes, managing stress in the workplace and get[ting] along with coworkers and customers." (AR 2061 (citing AR 2032).) In the ALJ's view, these opinions, when compared with those of Dr. Beale, were "better supported by and consistent with objective findings including observations of normal behavior, fully oriented with good eye contact, and good recall." (AR 2062.) The ALJ further found that Dr. Whitlock and Ms. Jimenez's opinions were "more consistent with the medical evidence of record showing that [Plaintiff] . . . reported improved mood with medication" (AR 2062 (citing AR 2479–2583)), with notations in the record that she was able to attend bible study group, and with observations of calm and cooperative demeanor (AR 2062 (citing AR 2539)). The ALJ found, by implication, that Dr. Beale's opinions were inconsistent with such medical evidence.

Plaintiff maintains that it was improper for the ALJ to reject Dr. Beale's opinions on the basis of inconsistency, given that "Dr. Beale treated [her] for over two years and therefore had great knowledge of her mental impairments." (Doc. 20 at 13.) According to Plaintiff, her multi-year treatment relationship with Dr. Beale and his "lengthy and detailed" treatment records dictate that "any opinions from other providers that differ from his conclusions should be the ones deemed to be 'not consistent with the record.'" (*Id.*) But Plaintiff misunderstands the applicable standards

of review and the Court's role in this case. Where the ALJ determined that Dr. Beale's opinions were entitled to little weight because they were not internally supported or consistent with the record, (*see* AR 2061–62), the Court's role is not to reweigh the evidence but, rather, to satisfy itself that the ALJ provided "good reasons in [her] decision for the weight [s]he gave to the treating source[] opinions." *See Oldham*, 509 F.3d at 1258; *see also Watkins*, 350 F.3d at 1301 (10th Cir. 2003) ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.") (quotation and citation omitted). For the reasons just discussed, the Court finds the ALJ's analysis in this regard adequate and supported by substantial evidence.

Plaintiff highlights Judge Sweazea's direction that the ALJ, on remand, should "provide an adequate explanation" for the weight she assigned Dr. Beale's opinions and should "address the 'significantly probative' evidence that may be construed as supporting [his] opinions." (Doc. 20 at 12 (quoting AR 2173).) Plaintiff insinuates that ALJ Richter failed to follow these instructions in her 2021 decision. (*Id*. at 13.) Specifically, Plaintiff complains that the ALJ only briefly discussed Dr. Beale's opinions, devoting "less than one full page of her 19-page Decision" to them. (*Id*. at 12.) She further contends that the ALJ failed to address "any of the evidence" that Judge Sweazea discussed in his December 7, 2020 Order and, instead, simply concluded that Dr. Beale's "opinions 'were not consistent with the records.'" (*Id*. at 12–13.) But Plaintiff's characterization of the ALJ's 2021 decision is not accurate. In particular, the ALJ noted many, if not most, of Dr. Beale's abnormal mental status examination findings. (*Compare* AR 2061–62, *with* AR 1975–2006.)

Further, even if the comprehensiveness of ALJ Richter's 2021 decision did not match that of Judge Sweazea's Order, it does not necessarily follow that the ALJ's decision fails to pass muster under the relevant standards. The Commissioner "acknowledges that the ALJ did not discuss every record cited in [Judge Sweazea's] Order" but insists that the ALJ's 2021 "decision reflects that she reasonably considered the longitudinal record described by these notes, including the uncontroverted evidence she chose not to rely on and the significantly probative evidence she rejected." (Doc. 26 at 10 (citing *Clifton*, 79 F.3d at 1009–10) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence".)) The Court agrees. For the reasons discussed above, the Court is satisfied that the ALJ adequately articulated legitimate reasons for discounting Dr. Beale's opinions and supported those reasons with citations to and discussions of inconsistencies in the record that allow this Court to follow her reasoning.

As discussed above, the ALJ rejected Dr. Beale's opinions as inconsistent with the record in part because they conflicted with entries in CNP Meyer's 2020 records indicating that Plaintiff cared for her grandchildren and attended bible studies. (AR 2062 (citing AR 2510).) Plaintiff contends that the ALJ's reliance on these records was error in two respects. (Doc. 20 at 13.) First, although Plaintiff's argument is not fully developed, she appears to take issue with the ALJ's failure to mention, concurrently with her discussion of Plaintiff's babysitting and church-related activities, that CNP Meyer assessed various impairments, including severe depressed bipolar disorder, PTSD, insomnia, chronic pain, and fibromyalgia. (*See id.*) The Court finds no reversible error in this regard, however. At step two of her analysis, the ALJ characterized each of the conditions CNP Meyer assessed as a severe impairment, (AR 2050), and thereafter she considered each of Plaintiff's medically-determinable impairments in assessing Plaintiff's RFC, (*see* AR

2049, 2054–63 (citing 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p).) Plaintiff fails to present any compelling argument to the contrary.

Second, and relatedly, Plaintiff contends that her testimony at the May 20, 2021 administrative hearing undermines the ALJ's finding, on which the ALJ relied to reject Dr. Beale's opinions, that Plaintiff could engage in robust activities of daily living, including attending bible study and babysitting grandchildren. (Doc. 20 at 13.) Regarding bible study attendance, Plaintiff highlights her own testimony that she stopped going to church in 2017, and that she stopped attending bible study in 2020 because she "felt no interest in going anymore . . . [and] started isolating [her]self." (Id. (quoting AR 2104–05).) But as the Commissioner observes, "Plaintiff's testimony and the treatment note cited by the ALJ," which indicate that Plaintiff attended bible study until sometime in 2020, actually "support[] a conclusion that she was going to bible study well after [Dr. Beale] rendered his opinion[s]" in 2015 and 2017. (Doc. 26 at 15 (citing AR 1974, 1965, 2104–05).) Thus, the ALJ reasonably relied on this activity in weighing Dr. Beale's opinions.

Plaintiff also cites to her hearing testimony to qualify the reports in CNP Meyer's records regarding her childcare activities. (Doc. 20 at 13.) She attempts to demonstrate, for example, that "her babysitting of the grandchildren [was] limited to monitoring her grandson's oxygen and doing little things like microwaving food." (Id. (citing "Pages 72, 73 of 87"[13]); see also AR 2106 ("I just kind of like maybe give them something to eat or something like that, but I don't take care of them at all. . . . Maybe put something in the microwave or, you know, give them their pajamas."), AR 2106–07 ("I might make a bottle . . . maybe go and get a diaper."), AR 2107 ("[T]hey had homecare coming over, checking [the babies'] oxygen . . . I would just go sit with my daughter, make sure

---

[13] Plaintiff's citations in her brief do not correlate to the pagination in the administration record; however, the Court is largely able to determine from context to which documents Plaintiff refers.

she didn't have any, like, you know, moments or make sure the babies were just okay. I really just sat there and made sure she was okay.").) As the Commissioner points out, however, this testimony—even if fully credited—does not necessarily undermine the ALJ's rejection of Dr. Beale's opinions. Rather, it appears to merely go to the weight of the evidence regarding Plaintiff's childcare activities, which is for the ALJ, and not the Court, to assign. (Doc. 26 at 15 (citing *Olson v. SSA*, 843 F. App'x 93, 97 (10th Cir. 2021) (reasoning that the plaintiff's contentions about evidence did not necessarily establish that she was disabled or show reversible error but merely went "to the weight of the evidence.").)

Moreover, the ALJ did not ignore Plaintiff's hearing testimony about her church and babysitting activities. (*See* AR 2055 (discussing Plaintiff's testimony that she cannot interact with her grandchildren and has not attended church since 2017 or bible study since 2020).) Rather, having acknowledged Plaintiff's testimony on this and other points, the ALJ explained that Plaintiff's "statements concerning the . . . limiting effects of [her] symptoms [were] *not entirely consistent* with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 2055 (emphasis added).) Elaborating, the ALJ noted, among other things, that "the record shows [Plaintiff] has a good capacity for performing her activities of daily living" and "is able to engage in self-care, babysit her grandchildren, attend bible studies, prepare simple meals and manage finances." (AR 2055 (citing AR 1518 (May 2015 progress note from Edgar Lisansky, M.D., rating Plaintiff's capacity for performing activities of daily living as "good" ), AR 356–58 (July 2013 Function Report in which Plaintiff reported that she had "no problem" with "personal care," took medicine without help or reminders, prepared meals, shopped in stores once per month, and was able to pay bills, count change, handle a savings account, and use a checkbook or money orders), AR 522 (June 2011 record from CNA Ventura indicating that Plaintiff was "[d]oing

childcare this Summer"), AR 2510 (Sept. 2020 record from CNP Meyer indicating that Plaintiff "goes over during the day to help with the grandbabies" and "the older two kids" and "continues to go to bible studies on Tuesday nights")).) Thus, the ALJ's reliance on Plaintiff's childcare and bible study activities to explain the weight she assigned Dr. Beale's opinions is supported by substantial evidence.

In her reply, Plaintiff insists that she is not asking the Court "to 're-weigh' the evidence" and that her "concern is that the ALJ did not consider material evidence," especially evidence in Dr. Beale's treatment notes that the Court specifically ordered the ALJ to consider. (Doc. 27 at 6-7.) Yet, Plaintiff does not identify any significantly probative evidence contained in Dr. Beale's records that would support his opinions but that the ALJ failed to discuss. (*See* Docs. 20, 27.) As such, Plaintiff fails to demonstrate that the ALJ, in her 2021 decision, picked and chose among Dr. Beale's findings to consider only those findings that support her rejection of his opinions.

In sum, although ALJ Richter could have addressed Dr. Beale's opinions in more depth, the regulations only required her to give good reasons for the weight she gave them. *See Oldham*, 509 F.3d at 1258 (reasoning that an ALJ need not expressly apply each of the six relevant factors in deciding the weight to give a medical opinion). The ALJ offered legitimate explanations for rejecting Dr. Beale's opinions, and the Court will not accept Plaintiff's implicit invitation to reweigh those opinions against the other evidence in the record. Because the ALJ followed the applicable law in her treatment of Dr. Beale's opinions and her findings are supported by substantial evidence, Plaintiff's motion on this ground is denied.

### B. The ALJ's decision was supported by substantial evidence.

Plaintiff next argues that the "ALJ largely ignored a whole set of evidence which supported [Plaintiff's] position." (Doc. 20 at 14.) To support this broad contention, Plaintiff offers what she

describes as "pertinent points" from her hearing testimony. (*Id*. at 14–17.) Essentially, she summarizes her testimony on topics spanning her symptoms from physical and mental impairments to her inability to perform certain tasks. (*See id*. at 14–16 (outlining testimony regarding nerve damage in her back, arthritis, torn meniscus, carpal tunnel syndrome, fibromyalgia, bipolarity, depression, isolation, anxiety, back and hip pain, anger, inability to concentrate, inability to walk or stand for significant periods and inability to perform certain household chores or to drive).) Plaintiff then suggests, in a conclusory manner, that the ALJ "barely mentioned any of the aforesaid medical records or the Plaintiff's testimony." (*Id*. at 17.)

To the contrary, the ALJ's discussion of Plaintiff's hearing testimony substantially addressed the testimony topics Plaintiff enumerates. (*See* AR 2054–55.) Moreover, after discussing Plaintiff's testimony and subjective complaints of symptoms, the ALJ determined that Plaintiff's allegations were "not entirely consistent with the medical evidence and other evidence in the record." (AR 2055.) The ALJ thoroughly discussed Plaintiff's physical impairments, including the symptoms she alleged in her testimony, but described her physical exams as "unremarkable" overall. (AR 2054–58). The ALJ noted that Plaintiff had "normal gait, full muscle strength, full range of motion, intact sensation, . . . normal reflexes, [and] negative special tests." (AR 2058.) She observed that imaging showed only "moderate foraminal stenosis" and noted improvement with medications and other treatment. (AR 2058). Even so, the ALJ limited Plaintiff to "light work with additional postural, manipulative and environmental limitations to account for deficits from [physical] impairments." (*See* AR 2058.) Likewise, the ALJ thoroughly discussed the evidence and testimony related to Plaintiff's mental impairments, including evidence regarding her 2015 hospitalization, mood swings, anger episodes, panic attacks, and isolation. (AR 2055, 2058–59.) And as with her physical impairments, the ALJ included limitations in Plaintiff's RFC

"to account for memory, concentration, social [functioning,] and adaptation deficits." (*See* AR 2059.)

Beyond her vague assertion that the ALJ "barely mentioned" the impairments and symptoms about which Plaintiff testified, which the record does not support, Plaintiff fails to identify any specific legal errors the ALJ committed in her consideration of hearing testimony or subjective symptom evidence or in her determination of Plaintiff's RFC. (*See* Docs. 20, 27.) The Court will not develop these arguments on Plaintiff's behalf. As such, Plaintiff's Motion on this ground is denied.

### C. The ALJ considered Plaintiff's impairments in combination.

Plaintiff also contends that the ALJ failed to consider the combined effects of her various impairments. (Doc. 20 at 17–18.) To be sure, "the ALJ must 'consider the combined effect of all of [the claimant's] impairments." *Langley*, 373 F.3d at 1123–24 (quoting 20 C.F.R. § 404.1523). Here, the ALJ acknowledged that she was tasked with determining whether a "medically determinable physical or mental impairment *or combination of impairments*" caused Plaintiff to be disabled under the relevant sections of the SSA. (AR 2047 (emphasis added).) Moreover, the ALJ's analysis of Plaintiff's impairments leaves the Court with no reason to doubt that she followed this mandate. (*See*, e.g., AR 2051 ("The claimant does not have an impairment or combination of impairments that meets or medically equals" the Listings.), AR 2052 (specifying that she considered Plaintiff's diabetes, fibromyalgia, headaches, and mental impairments "in combination" with her other impairments); *see generally* AR 2054–63.)

Plaintiff points to her own testimony to provide "several examples of the 'combination'" of her impairments. (Doc. 20 at 17.) But the ALJ discussed Plaintiff's testimony and, in so doing, acknowledged the interconnectedness of Plaintiff's impairments. (*See* AR 2054–55.) Specifically,

the ALJ observed that Plaintiff's "back and hip pain . . . affect her ability to stand"; her "carpal tunnel syndrome . . . causes her to have generalized pain and insomnia"; her "insomnia contributes to her bipolar, which causes her to have anger episodes"; her "fibromyalgia and mental symptoms" cause her to "isolate from others"; and, "she is unable to stay in relationships because she has difficulty trusting other people and has ang[er] episodes." (AR 2054–55.) The Court can discern no error in this regard.

Plaintiff also relies heavily on the "extremely high number of severe impairments" the ALJ found. (Doc. 20 at 17.) She contends that "[t]he 17 individual impairments represent a broad spectrum of both physical and mental impairments" and "a combination of any or all of these impairments would require a finding of disability." (Do. 20 at 17.) But Plaintiff's argument is conclusory and not supported by any legal authority. Moreover, the Court is satisfied that the raw number of Plaintiff's severe impairments, even at 17, is not dispositive of whether her RFC would allow her to perform past relevant work or other jobs that exist in significant numbers in the national economy and thus whether she is disabled under the SSA. *See Oldham*, 509 F.3d at 1257.

Overall, the Court is satisfied that the ALJ considered Plaintiff's impairments singly *and in combination* throughout the sequential evaluation process (*see* AR 2047–65), and Plaintiff does not develop any compelling arguments to suggest otherwise. The Court will deny Plaintiff's motion on this ground.

### D. The ALJ properly included the limitations in Plaintiff's RFC in her hypothetical questions to the VE, and any error in the scope of these questions was harmless.

In her final argument, Plaintiff contends that "the ALJ's [step five] conclusions were based upon testimony from the [VE] in which the ALJ submitted hypothetical questions which did not encompass the Plaintiff's limitations." (Doc. 20 at 18.) Plaintiff adds that the hypothetical questions the ALJ posed to the VE fail to "encompass many of the limitations [she] identified in

[her] Brief." (*Id*. at 19.) But the only "limitations" she identifies relate to her claimed inability to vacuum or mop floors. (*See id*. at 18–19.) Specifically, Plaintiff points to her hearing testimony that she cannot mop or vacuum and quotes an exchange between her attorney and the VE, in which the VE testified that if the ALJ's hypothetical had included a limitation on vacuuming and mopping, it would have precluded the hypothetical individual from working as a housekeeping cleaner. (*Id*. (citing "pp. 12-13" and "page 39"); *see also* AR 2089-90, 2116.) On this basis, Plaintiff argues that the "V-E's testimony of job availability was based upon an incomplete premise." (Doc. 20 at 19.)

An ALJ, however, need only include in her hypothetical questions to a VE those limitations she ultimately assesses in the RFC she assigns the claimant, not all of the limitations alleged in the claimant's brief or testimony. *See Smith v. Colvin*, 821 F.3d 1264, 1270 (10th Cir. 2016 ("The [ALJ] had to ask only about the effect of those limitations ultimately assessed; the [ALJ] did not need to ask about the effect of limitations that he didn't believe applied."). Moreover, even if the Court were to find that the ALJ erred in failing to include an inability to vacuum or mop in her hypotheticals to the VE, this error would be harmless. *See generally Fischer-Ross v. Barnhart*, 431 F.3d 729, 733–34 (10th Cir. 2005) (harmless error analysis, though it should be applied "cautiously in the administrative review setting," may nevertheless be "appropriate" where court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"). As previously noted, at step five, the ALJ found that Plaintiff was not disabled because she had the RFC to work not only as a housekeeping cleaner, but also as a mail clerk or sorter. (AR 2064.) Plaintiff presents no argument to challenge the ALJ's step-five findings regarding the latter two representative occupations, and there is no

apparent reason why an inability to mop or vacuum would preclude someone from fulfilling these jobs' requirements. As such, the Court will deny Plaintiff's motion on this final ground.

## V.  CONCLUSION

Having conducted a thorough review of the administrative record, the Court concludes that the ALJ did not legally err in her review of Plaintiff's application for DIB and SSI and that her findings are supported by substantial evidence. Accordingly, Plaintiff's Motion to Reverse the Administrative Law Judge (ALJ) Unfavorable Decision Dated July 29, 2021, or Alternatively, to Remand the Case Back to the Administrative Law Judge (ALJ) (Doc. 19) is **DENIED.**

**KIRTAN KHALSA**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**